IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RONALD SELTMAN, | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | |
| v. | : | NO. 11-07195 |
| | : | |
| EXELON CORPORATION, | : | |
| Defendant | : | |

**M E M O R A N D U M**

**STENGEL, J.**                                                                                                         September 27, 2012

Ronald Seltman filed an employment discrimination action against his former employer alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, a violation of the Pennsylvania Human Rights Act,[1] and the state tort of intentional interference with prospective contractual relations.  This case was originally filed in the Court of Common Pleas of Lehigh County, and removed here by the defendant.

The defendant filed a motion for summary judgment to which the plaintiff responded.  For the following reasons, I will grant the defendant's motion in its entirety and enter judgment on its behalf.

---

[1] Title VII prohibits employers from retaliating against employees who oppose discriminatory employment practices or file their own charges of discrimination.  See 42 U.S.C. § 2000e-3(a).  The PHRA also prohibits an employer from discriminating against employees who oppose discrimination or file charges of discrimination.  43 PA. CONS. STAT. § 955(d). While Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, its courts nevertheless generally interpret the PHRA in accord with its federal counterparts.  Gomez v. Allegheny Health Servs., Inc., 71 F.3d 1079, 1083-1084 (3d Cir. 1995).

**I. BACKGROUND**[2]

Ronald Seltman's employment with Exelon Corporation began on May 11, 1987 and ended on November 19, 2007. Pursuant to his employment, Mr. Seltman applied for and received unescorted access to Exelon's Limerick Generating Station, a nuclear power plant, which was a requirement for his position as a Health Physics Technician II. As part of this process, Mr. Seltman signed two Exelon PADS[3] Consent Forms in which he agreed that Exelon could obtain, retain, and transfer information necessary to determine whether to grant him unescorted access to a nuclear power plant. These forms specifically provide that the information obtained would be used in determining that an individual is trustworthy, reliable, and fit-for-duty, and that the results of that determination must be available to other power reactor licensees.

By signing the forms, Mr. Seltman acknowledged that the information would include, but is not limited to, dates when unescorted access has been authorized or terminated, and the date of any denial of access and the company holding the relevant information. The forms authorized any individual, organization, institution, or entity that now has, or obtains in the future, access-related information about him, whether or not such information is included in the PADS database, to release any such information in

---

[2] The majority of the facts are taken from the defendant's statement of undisputed facts. Pursuant to Rule 56(e)(2) of the Federal Rules of Civil Procedure, because the plaintiff has failed to address the defendant's assertion of facts as required by Rule 56(c), I will consider the defendant's facts undisputed for purposes of this motion.

[3] PADS, an acronym for "person access data system," is a computerized, restricted-access data system which shares information necessary to process the applications of workers for unescorted access to nuclear power plant protected areas. This system permits nuclear power licensees and their accepted contractors/vendors to meet regulatory requirements mandating that certain information be available to any power reactor licensee by retaining certain access information in a central computer database.

order to perform the investigation and evaluation required for unescorted access. Moreover, Mr. Seltman released Exelon, other PADS participants, the Nuclear Energy Institute, and the officers, employers, representatives, agents, and records custodians of any entity or individual supplying such information from any and all liability based on their authorized receipt, disclosure, or use of the information obtained pursuant to the Consent and to determine his eligibility for unescorted access.

In 2007, Exelon began an internal investigation of employee misconduct involving an employee-reported incident of sexual harassment which had occurred five years before in the men's locker room with four men present.[4]  On April 24, 2007, Mr. Seltman was questioned by Exelon security about his role in the incident.  A month later, as a result of the investigation, Exelon informed Mr. Seltman that it was denying his unescorted access to its nuclear plants based on trustworthiness and reliability.[5]  Mr. Seltman internally appealed his denial of unescorted access, which was denied by letter dated September 14, 2007.  The denial of his unescorted access was thus upheld.  Mr. Seltman was given ninety days within which to find employment at Exelon which did not require unescorted access.  He was unable to do so.

---

[4] Michael Gerhart, one of the men allegedly present during this incident, also brought similar claims against Exelon alleging retaliation in violation of Title VII and the PHRA, and the state law tort of intentional interference with prospective contractual relations.  I granted Exelon's motion for summary judgment based on Mr. Gerhart's waiver of all these claims. Gerhart v. Exelon Corp., 2011 U.S. Dist. LEXIS 18788 (E.D. Pa. Feb. 21, 2011), aff'd, 461 Fed. Appx. 143 (3d Cir. 2012).

[5] When unescorted access is removed for any reason, employees, contractors, and vendors are legally prohibited from accessing the vast majority of Exelon's nuclear power plant locations, potentially resulting in termination of employment if such access is necessary for the employee to perform his or her job duties.  See Sharpe Certification, Document 9-2 at 6.

On November 19, 2007, Exelon Generation terminated Mr. Seltman's employment. On that same day, Mr. Seltman signed a Waiver and Release under the Exelon Corporation Severance Benefit Plan which released Exelon Corporation and its affiliated entities, including but not limited to Exelon, from all claims that otherwise could have been asserted by Mr. Seltman arising out of his employment and/or termination of employment with Exelon, including claims under Title VII, claims under any state anti-discrimination law, breach of contract claims, and tort claims. As consideration for the Waiver and Release, Mr. Seltman received salary continuation for sixty weeks in the amount of $88,608.00; payment of Mr. Seltman's COBRA premium during those sixty weeks in an amount equal to that which Exelon contributed for active employees; life insurance coverage at Exelon's expense; and tuition reimbursement.

Mr. Seltman filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission and cross-filed with the Pennsylvania Human Relations Commission. Although signed by Mr. Seltman on September 12, 2008, the Charge of Discrimination is time-stamped as filed with the EEOC on September 27, 2008.

## II.  STANDARD OF REVIEW

A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED.R.CIV.P. 56(a). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. Id.

4

A party seeking summary judgment always bears the initial responsibility for informing the court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." Id. at 325. A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, interrogatory answers or other materials. FED.R.CIV.P. 56(c)(1)(A). That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. at 322. Under Rule 56, the court must view the evidence presented on the motion in the light most favorable to the opposing party. Anderson v. Liberty Lobby, Inc., 477 U.S. at 255. The court must decide not whether the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. Id. at 252. If the non-moving party has exceeded the mere scintilla of evidence threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against the opponent, even if the quantity of the movant's evidence far outweighs that of its opponent. Big Apple BMW, Inc. v. BMW of North America, Inc.,

974 F.2d 1358, 1363 (3d Cir. 1992).

## III.  DISCUSSION

### A.  Mr. Seltman's Title VII and PHRA claims are untimely

Exelon first argues that it is entitled to summary judgment because Mr. Seltman's Title VII and PHRA claims are time-barred.  Mr. Seltman fails to challenge Exelon's allegation of untimeliness.  His failure to do so, however, is inconsequential because these claims are in fact untimely.

PHRA and Title VII claims must be filed 180 and 300 days, respectively, from the date of the adverse employment decision.  See 43 P.S. § 959(h); 42 U.S.C. § 2000e-5(e)(1).  An adverse employment decision occurs, and starts the statute of limitations running, when the employee receives notice of the action and termination is a delayed but inevitable result.  Delaware State College v. Ricks, 449 U.S. 250 (1980) (approving the maxim that "the proper focus is upon the time of the discriminatory acts, not upon the time at which the consequences of the acts became most painful").

In Watson v. Eastman Kodak Co., the Court of Appeals for the Third Circuit held in a similar action that an employer's adverse employment action occurred when the employee was notified of his job demotion by letter and not on the date of his actual termination.  235 F.3d 851, 857 (3d Cir. 2000).  Plaintiff Watson was terminated after he was demoted from his Account Executive position and failed to find another position in the company within thirty-one days as set forth in his demotion letter.  Id. at 853.  The District Court, using the date of his demotion letter as the start of the limitations period, found his subsequent Title VII claim untimely due to his failure to file within the required

6

300 days. Id. at 854. Because his demotion letter left open the possibility of continued employment, the plaintiff argued that his termination was not inevitable at that point, so the limitation period should start on his actual termination date, and his claim was thus timely. Id. Concluding that the possibility of continued employment did not alter the Ricks notification rule, the Third Circuit affirmed the District Court's determination that Watson's claim was untimely. Id. at 857.

Here, Mr. Seltman's Charge of Discrimination was received by the EEOC on September 27, 2008. It makes no difference upon which adverse employment decision Mr. Seltman bases his claims. To be timely filed, the Charge would have had to be based on a decision rendered on or after December 2, 2007, i.e., within 300 days of September 27, 2008. All of the possible dates in this case pre-date December 2, 2007. On May 31, 2007, Mr. Seltman received a letter informing him of the denial of his unescorted access which was a requirement for his job. On September 14, 2007, he was notified that his appeal of that decision was denied and that the denial of unescorted access was upheld. And, after failing to find another job at Exelon within ninety days, he was terminated on November 19, 2007. Moreover, as in Watson, any possibility of continued employment provided by those ninety days, does not suggest that his termination was not an inevitable result of his denial of unescorted access. Watson, 235 F.3d at 857. This is especially true because the focus of Mr. Seltman's Charge of Discrimination centered on the denial of unescorted access which resulted in his termination from a position requiring that access, not termination from Exelon in general.

All of the possible dates of adverse employment decisions fall outside of the required three-hundred day period before the filing of the EEOC Charge, and render the Title VII and PHRA claims untimely. Therefore, I will grant the defendant's motion for summary judgment on Count I and Count II.

### B. Mr. Seltman knowingly and voluntarily waived his claims

In the alternative, even if Mr. Seltman had timely filed his Charge of Discrimination, his claims here are waived because, contrary to his assertion, he knowingly and voluntarily entered into the Waiver and Release.

A waiver is valid so long as it is entered into knowingly and voluntarily. Coventry v. U.S. Steel Corp., 856 F.2d 514, 522 (3d Cir. 1988) (citing Alexander v. Gardner-Denver Co., 415 U.S. 36, 39 (1974)). Courts in this circuit[6] use a "totality of the circumstances" test to determine whether a party knowingly and intelligently waived litigation rights. See Jakimas v. Hoffmann-LaRoche, Inc., 485 F.3d 770, 781 (3d Cir. 2007); see also Cirillo v. Arco Chem. Co., 862 F.2d 448, 451 (3d Cir. 1988), *superseded*

---

[6] I note that the Waiver and Release provides that: "This Waiver and Release shall be governed by the laws of the State of Illinois, to the extent such laws are not preempted by applicable federal law." See Document #9-2 at 20. The parties seem to have overlooked that provision because neither side applies Illinois law in their memoranda. It is of little consequence, however, because Illinois employs a similar totality of the circumstances test to determine whether a waiver was entered into knowingly and voluntarily. In Illinois, those factors include: "(1) the employee's education and business experience; (2) the employee's input in negotiating the terms of the settlement; (3) the clarity of the agreement; (4) the amount of time the employee had for deliberation before signing the release; (5) whether the employee actually read the release and considered its terms before signing it; (6) whether the employee was represented by counsel or consulted with an attorney; (7) whether the consideration given in exchange for the waiver exceeded the benefits to which the employee was already entitled by contract or law; and (8) whether the employee's release was induced by improper conduct on the defendant's part." Howell v. Motorola, Inc., 633 F.3d 552, 559 (7th Cir. 2011). The result is identical whether applying Pennsylvania law or Illinois law.

8

*by statute on other grounds*, *as recognized in* <u>Long v. Sears Roebuck & Co.</u>, 105 F.3d 1529, 1539 (3d Cir. 1997).  Relevant factors in reviewing the totality of the circumstances include:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether Plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

<u>Cirillo</u>, 862 F.2d at 451.

Here, under a totality of circumstances analysis, Mr. Seltman knowingly and voluntarily executed the Waiver and Release.  Mr. Seltman had over twenty years of experience at Exelon.  Although the record does not specifically refer to Mr. Seltman's education, his position of Health Physics Technician II at the nuclear facility would imply a level of sophistication, education, and intelligence sufficient to make an informed decision regarding the waiver.  In exchange for giving up his litigation rights, Mr. Seltman received $88,608.00 in salary payments, payment of his COBRA health insurance premiums, life insurance coverage, and tuition reimbursement.  Despite his lack of input in negotiating the terms of the waiver, these terms were not unreasonable or unfair, and there is no indication that Mr. Seltman asked for assistance, clarification, or more reasonable terms.  This generous consideration in exchange for the Waiver and

Release is more than what Mr. Seltman would have been entitled to receive by law upon termination from employment, namely, nothing.

I also note that the three-page Waiver and Release clearly and specifically outlines the parameters of the agreement and states that signing the agreement amounts to a "knowing[] and voluntary[]" agreement to the waiver of Title VII, state discrimination, and state tort claims. Mr. Seltman also was given forty-five days to sign the agreement and seven more days to revoke it after signing. See Document # 9-2 at 20, ¶ 11. Although the record does not indicate whether Mr. Seltman was represented by counsel or consulted with an attorney, the Waiver and Release states:

> I acknowledge that, at the time I was given this Waiver and Release, I was informed in writing by my employer that I had at least forty-five days in which to consider whether I would sign this Waiver and Release. I also acknowledge that, at the time I was given this Waiver and Release, I was informed in writing that I should consult with an attorney before signing this Waiver and Release. I have had an opportunity to consult with an attorney and have either had such consultations or have made a knowing, voluntary, and uncoerced decision to sign this agreement without consulting with legal counsel.

See Document #9-2 at 20. Thus, Mr. Seltman was given ample time to read and consider the clear terms of the Waiver and Release, to consult with an attorney before signing it, and even to revoke the waiver after he signed it.

Mr. Seltman argues, however, that his claims here are not waived because they arose after he signed the Waiver and Release. This assertion also has no merit. First, before he signed the Waiver and Release on November 19, 2007, Mr. Seltman was aware

10

that his unescorted access was denied, his appeal was denied, and his employment was terminated. The federal and state claims he brought here stem from those events. Second, even if a subsequent claim were to arise, Mr. Seltman's execution of the PADS Consent forms would preclude him from recovering on any claim related to his denial of unescorted access. In Gerhart v. Exelon Corp., the plaintiff sued Exelon for the same claims arising out of the same incident at Exelon in which Mr. Seltman was involved. He also argued that his claims were not waived because they occurred after the waiver was signed. In affirming this court's decision to grant Exelon's motion for summary judgment in that case, the Third Circuit found that even if there were a subsequent claim, it was barred by the PADS Consent form. 461 Fed. Appx. 143, 145 (3d Cir. 2012).

      Here, Mr. Seltman was aware of and agreed to the potential consequences of a denial of unescorted access when he executed the PADS Consent forms. By signing the PADS Consent Forms, Mr. Seltman acknowledged that dates of any denial of access and the company holding the relevant information may be transferred, electronically or otherwise, to other licensees and contractor/vendors or the agents of each. See Document #9-2 at 11-12. He also released the defendant and all other PADS participants from any and all liability based on their authorized receipt, disclosure, or use of the information obtained pursuant to the consent and to determine his eligibility for unescorted access. Id. Accordingly, by signing the Consent Forms, Mr. Seltman demonstrated that he understood and agreed that a denial of unescorted access could be disclosed to another entity, and therefore waived any claims related to that disclosure, including any future employment difficulties. Accordingly, even if his Charge of Discrimination were timely

11

filed, the Waiver and Release would have precluded Mr. Seltman from recovering on his Title VII and PHRA claims.  Because the Waiver and Release also included the waiver of any common law tort claim, I will enter summary judgment on behalf of the defendant on Count III.

**IV.  CONCLUSION**

Mr. Seltman was precluded from bringing every claim in this action.  The violations of Title VII and the PHRA in Count I and Count II are time-barred because Mr. Seltman failed to file a Charge of Discrimination within the statutory time frame. The claims in all three counts were also knowingly and voluntarily waived.  The plain language of the Waiver and Release indicated that all of the issues that Mr. Seltman has raised in this action were encompassed in the release.  The Waiver and Release, signed by Mr. Seltman, states in relevant part, "In exchange for the optional severance benefits to be provided . . . I knowingly and voluntarily agree to this waiver and release of claims."  See Document #9-2 at 18.  Further, the Waiver and Release states, "I understand and agree that, in signing this Waiver and Release, I am waiving and releasing any and all claims of whatever nature that I now have or that I may ever have had against the Released Parties up until the date I sign this Waiver and Release, including but not limited to: . . . (g) Claims of discrimination in employment or *retaliation* under any federal, state or local statute, ordinance, regulation or constitution; . . . and (i) Any common law or statutory claims of wrongful discharge and *any other common law tort* or statutory claims."  Id. at 19 (emphasis added).  There is also no indication that Mr. Seltman is insufficiently intelligent to have not understood the terms of the document,

especially given that he worked for over twenty years for the defendant and rose to the position of Health Physics Technician II.  The termination letter which accompanied the Waiver and Release advised Mr. Seltman to review the documents with an attorney before making any decision or signing the documents.  Id. at 22.  Mr. Seltman signed the Waiver and Release after his denial of access and his termination of employment.  He cannot dispute that he was aware of these two events before he signed the Waiver and Release.  In exchange, Mr. Seltman received adequate consideration, i.e., a handsome benefit package including salary continuation, payment of his health insurance premiums, life insurance coverage, and tuition reimbursement.  See Westak v. Lehigh Valley Health Network, 342 F.3d 281, 294 (3d Cir. 2003) (severance paid to the terminated employee was substantial and certainly in addition to what the employee was entitled to upon his termination – nothing).  I finally note that there is no evidence of fraud or undue influence on the defendant's part, or that enforcing any provision of this Waiver and Release would be against the public interest.  See Jakimas, 485 F.3d at 781.  Accordingly, I will grant the defendant's motion in its entirety.

     An appropriate Order follows.